Thank you. John Bunnett, representing plaintiff and appellate Mirlan. I'd like to take an opportunity to thank you for the time and attention you've put into the case so far. I do consider it a privilege to be here before the Ninth Circuit. I want to begin my argument talking a little bit about the mutual intentions of the parties and then move on from there as to the approximate cause issue as to a direct loss and then end up speaking a little bit about the prevailing California law which provides that insured benefits can't be diminished by a third party contract. On the issue of the mutual intentions of the parties, under statutory construction in California, the mutual intentions of the parties at the time the contract is formed governs interpretation. Now, it is undisputably clear what Mirlan's intentions were. It relied on its policy and that was the reason why it did not require the tenants to pay rent under the leases after they had been displaced from the property. Mr. Bunnett, I guess I'm having a little trouble with this concept of the mutual intention of the parties. There are several contracts. There is the insurance contract that the lessor had and then there are the contracts related to the lessees which themselves contain an obligation to have a business interruption insurance. Is it your position that as an appellate court that we somehow have the ability to fathom what the parties were saying and agreeing to outside the language of the contract? I think you do from the respect that at the time the insurance contract was entered into, there is no evidence to the effect that affiliated FM even realized that there was a rent non-abatement clause in the lease. The landlord, right? I don't mean the insurance company, Mirlan. Mirlan's the landlord. They're charged with understanding what's in their lease, right? Correct. I assume they had an attorney draft it or is it an AIREA form? It's basically AIRE with some modifications. Okay, so by definition it's kind of a standard form business lease in California. It's pretty well known that they all contain business interruption requirements, no ability to abate the rent, and one of the things that landlords and tenants frequently tussle about is at what point after a disaster the obligation to continue to pay rent stops. Would you agree with that? Yes. Okay, under the circumstances, unless we postulate that when the insurance company and Mirlan entered into their discussions, there were no lessees or that there was a specific discussion that there would be no business interruption insurance taken on the part of the lessees, how can you say that we're dealing in a vacuum here? Wasn't it understood that there would be a requirement for business interruption on the part of the lessees? As far as between Mirlan and his tenants, correct. Correct. Under the circumstances, then, if that was the understanding and Mirlan says unilaterally you don't have to follow the lease, how can that be what the parties intended? Well, one of the things is in regards to the business interruption policy, and I pointed it out, the provisions are there not essentially to require that the benefits from the business interruption insurance be forwarded to Mirlan as far as its leases, but read in their entirety in the paragraph where they are contained, it would appear that those provisions are essentially there to exonerate Mirlan from any responsibility for any losses, which the tenant has. Okay. Well, let's assume you're correct about that. The reality is what happens, we see insurance companies fighting each other all the time, particularly in diversity actions, and they're trying to determine who's going to pay what portion of the losses. But here you have this equipose between the insurance companies of the lessees and the insurance company of the lessor, and presumably the insurance company of the lessor, pursuant to what you previously indicated, understood that there was going to be this requirement of the lessees. So if the lessees can't afford to pay it, they look to their insurance companies, and they either pay or they don't pay, and then you get a fight between the insurance companies. But here your principal, perhaps well-intentioned, perhaps without knowledge of the law, basically said, hey, I don't care what the contract says, you don't have to follow it, which takes away the other insurance company on the other side and then leaves the insurer, in the case of the landlord, with more of a liability than it was ever anticipating. Isn't that an accurate statement of what we have here? I think the statement is accurate, but I believe that in regards to Merlin's relationship with its tenants, it always had this longstanding policy that it would forgive the rents in this type of a situation. Well, why does it say to the contrary in the leases? Well, it says a few things in the leases. That provision appears to be in there, however. It is in there. Yeah, it is. But whether Merlin wants to enforce that provision or not, that's up to Merlin. But it does so at the damage to affiliated, which essentially resulted in aggravating the loss that it then asked the liability insurer to pay for the fire. And the question is, was that the proximate cause, or was it an intervening cause that relieves the insurer of the obligation to pay? I don't think that it would be an intervening cause. The fire is certainly the cause of Merlin's losses. But for the fire, the tenants would be in the property and they would pay the rent. Right. I take it there's nothing in this record that indicates that this insurer in the past paid insurance, paid rent claims for rent that had been excused by your claim. Not this insurer. Okay, not this insurer. But that leads us into the bowling cases and its prodigy as far as these third-party contracts under California law cannot diminish an insurance company's responsibility to the insured. That's the... But with respect, sir, aren't you going far afield from the reality of this situation? I mean, the fact is that when the insurance company insured this situation, as you previously agreed, there were tenants, there were contracts, there were leases, and the leases said they were going to carry liability insurance. That's very different than a traditional third-party interference situation, is it not? I think it's very clear if you follow the case of Hughes and Foley and Strickland that have been cited. There was a case, Citizen Insurance Company v. Fox built at 226 F. Second, 641. They held that the tenant of a business premises could recover on its fire insurance policy for damage to its office space even though the building owner repaired the damage at his expense pursuant to the terms of the lease. We had the same situation here. It's very different, though. But in that situation, the tenant had nothing whatsoever to do with the act that caused the insurance to be... well, the assumptions to be changed. Here it was your client that said, hey, you don't have to pay this. They're the insured, and they're the ones that are damaging their own insurer. So that's quite different, is it not, than the facts that you just recited from the other case? I think it is somewhat different. I think the principle is prevailing as far as this is the law in California. We don't look to the third-party contracts. In the Foley case, they didn't know whether the contractor would perform or not. In this case, Merlin didn't know if its tenants would perform or not. You have used your time. Thank you. Judge Townley, Judge Schroeder, and Judge Smith, thank you very much. I want to join Mr. Bunnett in thanking you for hearing our case. My name is Jeffrey Gassell, and I represent Foley FN Insurance Company, the affiliate in this matter. Your Honors, Judge Phillips's ruling in this case was correct, and it was well reasoned. The central issue here, as was noted by Judge Smith, is that Merlin indisputably chose to incur the rental income losses it claims. The terms of the leases that Merlin itself drafted between itself and its tenants establish a risk allocation scheme that allocates the risk of fire-related business income losses to its tenants. Well, that wasn't the risk that affiliated underwrote, though, was it? It underwrote a risk that included lost rents in the event that the premises were rendered uninhabitable by fire. It's a very good question you raise, Judge Townley, and I believe that you're going to the issue of illusoriness. Is this contract illusory in whole or in part as to Merlin? Well, there's no question that absent the separate third-party contracts with the tenants, if the tenants had not paid rent on the premises because the fire had rendered them uninhabitable, then affiliated would have been clearly obligated under the terms of the policy to pay Merlin for that lost income, would it not? Not necessarily, Your Honor, because in that event, still, as Judge Phillips recognized, and as I believe Your Honors have recognized as well to some degree, these leases make the occurrence of the fire, in a sense, absolutely irrelevant to the requirement that the insurance company here, affiliated FM, pay business income losses to the insured in this case. That being said, there is still no illusory contract here. I'm not sure I understood your answer to my question. Wasn't there a provision in this comprehensive general liability policy that said, if there was a loss of income caused by uninhabitability, then affiliated would pay Merlin for the loss? Absolutely. The policy does state that it... But what we have here, what's complicating things is we've got this completely separate set of contracts between the landlord and the tenants, which essentially transferred the risk to them, and that was what was waived or abated by the landlord on the night of the fire. Yes, Your Honor. So why shouldn't affiliated still have to pay out on the policy and then have some kind of a right of action against the insurers for the tenants for that? Sorry. Because of the issue of the intervening cause that has been established here by Judge Smith, the issue is that the policy sets up the coverages that it will pay out, and it indicates that it will cover the loss of income sustained by the insured, resulting directly from the necessary unfinitability caused by loss, damage, or destruction by any of the perils covered herein, i.e. fire. The problem with this situation for Merlin is that the fire did not cause the rental income losses that Merlin claims. Merlin itself incurred those losses. If the tenant had gone to Merlin and said, the fire has wiped me out and I can't pay the rent, then what happens then? In that situation, Merlin would likely have an action against its tenant pursuant to the terms of leases itself, which would provide a contractual cause of action by Merlin against its tenants for breaking the lease. That still, in my mind, would not create a liability or a coverage situation under this policy. In the typical California real estate scheme like this, this is what happens that the insurer of the lessor, in this case your client, looks to the insurers of the tenant, particularly if the tenant goes bankrupt. For example, if you say you have a big office building and the thing burns down or something happens where they're just shut out, they can't do business, they go out of business, then you have a fight between the two insurers. But in this case, you have a situation where the standard expectation of the lessor's insurer is frustrated because of something that the lessor does in this case. That cuts off the standard underwriting practice by saying you don't have to pay. Absolutely, Judge Smith. I completely agree. As you indicated during appellant's time, there is no way in which this Court can fathom any extrinsic intentions, if there were any, of the parties to the leases, apart from what has been said. Let me ask my question again. Yes. If the tenant had come to your client and said, I'm wiped out, I can't pay the rent, you said your client would have a cause of action against the tenant. Well, that's not going to get him any place. So is the answer that your client would look to the insurer of the tenant? I believe that that is a possibility. Now, the question that you raise is, taking it a step further, would the ---- I'm just trying to figure out what this clause covers. Well, actually, isn't it more complex than that? Doesn't your company sue the lessor, who sues the lessee, who sues its insurance company? Absolutely. Isn't that the privity of contract in this case? Yes. Absolutely. So they're all in one big action. Yes. Absolutely. But you raised a good question, Judge Schroeder, and I appreciate it. What does this clause in the policy cover? Well, it does cover a host of actions that ---- or a host of claims that could be brought by other insurers under the SEBA collection of entities. SEBA is the Commercial Industrial Business Owners Alliance. They, as a mass of owners, purchased a policy for themselves, and this is what the policy covers. Now, there is coverage, obviously, for other business owners, to the extent that they draft their leases in ways that allocate business losses differently. There's also coverage for Merlin itself, despite the way it's drafted its leases. If you look at the loss of income provision in the policy, income is defined as, of course, gross rental income pursuant to bona fide leases, but it's also defined as income reasonably expected for rentals of unoccupied or unrented portions of such property. Now, if Merlin was going to enter into a lease with a new prospective tenant, and because of a loss, such as a fire or a flood, that tenant chose not to make a lease with Merlin, but decided to go elsewhere, i.e., a loss of prospective business sort of situation, the policy would cover for that. So, to say that there is some illusory nature to this contractor policy, or even this provision here, is absolutely inaccurate. It does cover certain situations, but what it does not cover is a voluntary business decision made by the insurer here. But it would have covered had there been no separate agreement between the landlord and the tenants allocating who had the obligation to make continuing payments if the premises were unfit for habitation. Absolutely, Judge Shum. It would have covered that, and it very likely does cover that, although I don't have other leases in front of me right here. It very likely does cover that for various other SEBA entities or owners. So, once again, we're brought back to plaintiff's argument that somehow extrinsic information should be used to counteract or to contravene the very clear business allocation scheme it has set forth in its leases, and yet plaintiff has not induced any information of such extrinsic mutual intentions or extrinsic understandings, simply not before this Court. How much is the claim here? Claims for about $175,000 plus interest. And without that evidence being induced, there is simply no way the Court can fathom what any mutual intentions would have been to the extent they existed. And so, for that reason, the plaintiff, Merlin, and the appellant here, simply has not discharged its burden of showing that the well-reasoned order by Judge Phillips was incorrect in any way. You have used your time. Are there any further questions on either side? Thank you. Thank you. Thank you. The matter just argued is submitted for decision. You'll hear the next case for argument, which is Parada-Chicas v. Holder.
judges: Schroeder, Tallman, Smith M.